UNITED STATES of America,

v.

**Dale TRASK, Defendant.**

**No. CRIM. 00CR10111–NG.**

United States District Court, D. Massachusetts.

April 20, 2001.

Allison D. Burroughs, United States Attorney's Office, Boston, MA, for Plaintiff.

Alan D. Rose, Rose & Associates, Boston, MA, for Defendant.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

Dale Trask ("Trask") was charged with "churning" in violation of 15 U.S.C. § 78j(b) and Title 17, CFR, § 240.10b–5. He pled guilty to the charges on June 27, 2000, with a sentencing set for September 6, 2000. I sentenced Trask to fifteen months, with a recommendation that he be incarcerated at Ft. Devens and participate in the 500 Hour intensive drug treatment program, with three years' supervised release. My reasons are as follows:

The defendant was charged with churning client funds belonging to George and Madelyn Davis during his employment as a stock broker. "Churning" occurs when a broker causes transactions to be made in a customer's account that are excessive in amount and frequency, given the nature of that account. The core of the accusation is that the broker is trading the account for his own benefit and gain, to maximize his commissions, rather than for the benefit and gain of the customer.[1]

---

1. The offense of churning in essence codifies common law liability for breach of a fiduciary duty owed to customers by their brokers.

Trask's choice of victim was particularly troubling. George B. Davis, then 90 years of age, gave Trask power of attorney in April 1993. In June 1996, Davis moved to a nursing home where he later died. Davis' wife, Madelyn, who suffered from Alzheimer's disease, died shortly afterwards. From July 1995 until August of 1996, the Davis account had an average account equity of $53,202.00. At the end of this period, the account had lost $64,206.00. Trask had generated approximately $43,214 in commissions by making 99 transactions on the Davis account. During an interview with the FBI, Trask readily admitted the crime.

All parties agree (1) that the base offense level under U.S.S.G. § 2F1.1 is six, (2) that the total loss was $64,206, which yields an increase of five levels under U.S.S.G. § 2F1.1(b)(1)(F), and (3) that the offense level should be increased by two on account of the reasonably known vulnerability of the victims under U.S.S.G. § 3A1.1(b)(1), and (4) that the total should be decreased for acceptance of responsibility under U.S.S.G. § 3E1.1.

Four issues are in dispute: (1) Whether the offense level should be increased for the abuse of position of trust under U.S.S.G. § 3B 1.3, (2) whether the offense level should be increased for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2), (3) whether the Court should depart from whatever level that results on the grounds that Mr. Trask's behavior was "aberrant", and, (4) whether the Court should depart downward from the level IV criminal history, on the ground that that level overstates his culpability.

## I. ENHANCEMENTS

### A. Abuse of Trust

U.S.S.G. § 3B1.3 provides for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense ..." In *United States v. Queen*, 4 F.3d 925 (10th Cir.1993), the Court of Appeals for the Tenth Circuit summarized the requirements for the application of this enhancement, stating it is appropriate "only if 1) the defendant occupied a position of trust, 2) the defendant abused this position in a manner that significantly facilitated his or her offense, and 3) abuse of trust is not included in the base level offense or specific offense characteristics pertaining to the defendant's crime." *Id.* at 927

On the first question, whether the defendant occupied a position of trust, "[t]he primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir.1996). Thus, for example, the adjustment would not apply to embezzlement by an ordinary bank teller whose position is not necessarily one of public or private trust characterized by professional or managerial discretion. Trask, a broker with a power of attorney, occupies the opposite end of the spectrum, as someone who held a position of significant trust that gave him the freedom to "churn" this account, largely undetected.

On the second question, causation, the Application Notes to § 3B1.3 at 1 state that "[t]he position of trust must have contributed in some substantial way to facilitating the crime or concealment of the offense (e.g. by making the detection of the offense or the defendant's responsibility for the offense more difficult.)" Here too, there is no question that the defendant's position of trust made the offense possible.

The problem arises with the third question, the relationship between the enhancement, on the one hand, and the underlying offense, on the other. The Guidelines indicate that § 3 B1.3 is not to be applied, "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." If the Commission has already included this factor in computing the base offense level, or if it is already included in a "specific offense characteristic" then it would be impermissible to take the factor into consideration as an enhancement to Trask's sentencing. Put otherwise, enhancement makes sense if the base offense level contemplated a range of misconduct, only some of which involved an abuse of trust. While the run-of-the-mill defendant would get the "regular" level, a subset of defendants would get this enhancement.

There is considerable ambiguity whether to use the guideline definition of base offense level or the statutory definition of the offense with which to compare the defendant's conduct. The issue is significant in this case. Churning under 15 U.S.C. § 78j(b) necessarily involves the acts of a broker in a position of trust. In contrast, the relevant Guideline is the general one for offenses involving fraud or deceit. If I focused on the Guideline I would enhance since some fraud offenses involve an abuse of trust and some do not. If I focused on the elements of the offense as defined in the statute, I would not enhance since churning necessarily involves abuse of a position of trust.

The Tenth Circuit, in three decisions, outlined the problem but did not resolve it. In *United States v. Chimal*, 976 F.2d 608, 613–614 (10th Cir.1992), the Court upheld an abuse of trust enhancement for a defendant convicted of embezzling from an Indian tribe in violation of 18 U.S.C. § 1163, focusing on the elements of the underlying offense. It concluded that although embezzlement by definition involves an abuse of trust to some degree, there were differences in how the crime could be achieved. Thus, "embezzlement by someone in a significant position of trust warrants the enhancement when the position of trust substantially facilitated the commission or concealment of the crime." *Id.* at 613 (quoting *United States v. Williams*, 966 F.2d 555, 556 (10th Cir.1992)).

In contrast, the court in *United States v. Levy*, 992 F.2d 1081, 1084 (10th Cir.1993) looked to the Guideline base offense level. Levy was a bankruptcy trustee who was also convicted of embezzlement in violation of 18 U.S.C. § 153. Because abuse of a position of trust was not a factor in the guideline base offense level for embezzlement, U.S.S.G. § 2B1.1, he too received a two point enhancement.

In *Queen*, 4 F.3d at 927, the Tenth Circuit Court of Appeals applied both approaches, concluding that enhancement was proper under either. The defendant was convicted of mail fraud for fraudulently obtaining money from investors by misrepresenting that he would invest their funds in precious metals and foreign currencies, and instead, misappropriated the investors' money. The Guideline base offense level was, as here, the fraud guideline, which did not factor in abuse of a position of trust. Likewise, the mail fraud statute was framed in general terms, requiring only that the defendant used the mails in furtherance of a scheme to defraud, not that the fraud constituted an abuse of a position of trust. The Court found that it was appropriate to enhance the sentence because the defendant belonged to a subset of defendants who had committed mail fraud by taking advantage of a position of trust.

Here the different approaches made a substantial difference in the outcome. I concluded that the Sentencing

Reform Act and the rule of lenity require that I focus on the statute. The Guideline regime was intended to "provide certainty and fairness in meeting the purposes of sentencing, avoid unwarranted sentencing disparities *among defendants with similar records who have been found guilty of similar criminal conduct* while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B) (emphasis added).

The range of behaviors included in the fraud guideline is defined too broadly to count all offenders to which the guideline could apply as having been found "guilty of similar criminal conduct." [2] If the rationale for the enhancement is that this defendant did something that made him more culpable then the ordinary defendant accused of a like offense, it makes little sense to include within the scope of comparison all fraud crimes of whatever nature. Therefore, I focused on the statutory definition of churning, which made enhancement under § 3B1.2 improper.

■ The Rule of Lenity confirms this approach. The Rule of Lenity suggests that penal statutes are to be strictly construed against the Government. *E.g. Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"); *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955). If there is ambiguity, then the Rule of Lenity is, in effect, a tie-breaker. Since the Sentencing Guidelines are subject to the gen-

eral rules of statutory construction, the Rule of Lenity is applicable in construing them. *See United States v. Luna–Diaz*, 222 F.3d 1, 3 n. 2 (1st Cir.2000) (noting that where a Guideline provision is ambiguous, the Rule of Lenity should be invoked to resolve the ambiguity in favor of the criminal defendant); *see also United States v. Diaz*, 989 F.2d 391, 393 (10th Cir.1993) (adopting the Rule of Lenity for interpretation of Guidelines).

**B.  *More Than Minimal Planning***

Similar issues are raised under U.S.S.G. § 2F1.1(b)(2), the guideline which permits an enhancement for "more than minimal planning." The Guidelines Commentary describes "more than minimal planning" as "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 1B1.1(1)(f).

■ If the basis for comparison is the churning statute, this is not "more than minimal planning." Churning by definition involves multiple transactions. If the basis for comparison is the fraud guideline, the analysis is more complex. The guideline includes a wide range of fraud offenses, some of which involve planning, some of which do not.

Again, the Rule of Lenity suggests that I decline to enhance the adjusted offense level to include "more than minimal planning."

Trask's adjusted offense level then was 11. With a criminal history score of IV, his guideline range would have been 18–21 months.

---

**2.**  This analysis could still be appropriate even if the guideline were more specific. For example, there is a very specific guideline for insider trading, § 2F1.2. At the same time, even that guideline makes a distinction be-

tween insider trading accomplished by a corporate president or an attorney who misused information regarding a planned but unannounced takeover, and an ordinary "tippee." Application Note 1 to § 2F1.2.

## II. *DEPARTURES*

The defendant entered into a plea agreement with the government on March 30, 2000, in which the government agreed, inter alia, to recommend incarceration for a period not to exceed 15 months. The defendant reserved the right to seek a downward departure on the grounds of aberrant conduct. It can be fairly implied from the plea agreement, corroborated by the government's statements at sentencing, that the government assumed Mr. Trask had no criminal record.

This was not the case. Probation, true to form, found that Mr. Trask's criminal history was not a category I but a category IV. Before Trask's guilty plea was entered in this case, and not disclosed to Pretrial Services or the government, Mr. Trask had been convicted of driving to endanger and driving under the influence on two occasions (January 11, 1996 and December 10, 1999) and arrested on a third occasion. (April 18, 2000). After the plea in this case, he was arrested yet again (on August 8, 2000) and sentenced to imprisonment for five months on the August 18 charge and two months on the April 8 charge, to run concurrently. He did not mention these convictions, he suggests, because he did not think they were serious enough to be counted by the federal court. His explanation is patently disingenuous.

Notwithstanding these events, and to its credit, the government stood by its original plea agreement and recommended fifteen months. Surprisingly, the defendant pressed his claim for a downward departure to a level warranting a sentence of probation.

■ The defendant argues that this conduct is "aberrant" in an otherwise law abiding life, within the meaning of Ch. 1, pt.A4(d).[3] He also argues for a downward departure for his efforts at rehabilitation while in state custody.

I declined to depart on either ground. Nothing about Trask's life, his stormy relationship with his wife, which generated two restraining orders, and his lack of candor with the government and pretrial services, militates in favor of a departure on either ground.

■ However, I departed one level, on the grounds that Trask's criminal history overstated his culpability. His criminal history category was IV out of a possible VI. There were no crimes of violence, or other convictions for fraud. Rather, he has a record for a succession of drunk driving convictions, reflecting a problem which had never been seriously addressed.

A one level departure brings Trask to a guideline range of 12–18 months. I will then sentence Trask to the fifteen months recommended by the Government.

The sentence is entirely appropriate. Two of Trask's convictions led to Mr. Trask's incarceration for five months, in between his plea and the date of sentencing on the federal charges. As a result of the sentence of this Court, Trask will return to custody for another fifteen months.

I have directed that he serve his sentence at the federal facility at Ft. Devens, participate in their 500 hour intensive drug treatment program, and continue that treatment during the three years of supervised release following his incarceration. The purpose of the sentence is to finally, and comprehensively, address what appears to be the principal source of Trask's problems, his alcoholism.

**SO ORDERED.**

---

**3.** The applicable "aberrant conduct" guideline is that in effect as of 11/98.